IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**WALTER MORRISON**,

    Plaintiff,

vs.                                    **No: 11cv1078 MV/LAM**

**SAM'S EAST, INC.,**

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's *Motion for Summary Judgment*, filed October 8, 2012 [Doc. 49]. Defendant seeks summary judgment in its favor on Plaintiff Walter Morrison's claim for racial discrimination brought under the New Mexico Human Rights Act ("NMHRA"), N.M.S.A.1978, §§ 28–1–1 to –15 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and on his state-law claim for negligent training/supervision. Having considered the parties' submissions, the relevant record, and the applicable law, the Court will grant the motion.

## I. Applicable legal standards

### A. Summary judgment

On a motion for summary judgment , the Court

> view[s] the evidence and its reasonable inferences in the light most favorable to the non-movant. Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party on the issue. An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim.

*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (internal quotation marks and citations omitted).

> Although the movant must show the absence of a genuine issue of material fact, he or she need not negate the nonmovant's claim. Once the movant carries this burden, the nonmovant cannot rest upon his or her pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof. The mere existence of a scintilla of evidence in support of the nonmovan's position is insufficient to create a dispute of fact that is 'genuine.'

*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The ultimate inquiry in a summary-judgment disposition is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986).[1]

### B. Racial-discrimination claims and shifting burdens

When considering a violation of either the NMHRA or Title VII, which both prohibit racial discrimination in employment, in the summary-judgment context when a plaintiff does not produce direct evidence of discrimination, the Court applies the *McDonnell-Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1972)*; Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1225-26 & n.4 (10th Cir. 2000); *Juneau v. Intel Corp*., 139 N.M. 12, 15, 127 P.3d 548, 551 (2005). "A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination." *Kendrick*, 220 F.3d at 1225.

---

[1] "Rule 56 was amended, effective December 1, 2010. Under the amended rule, the standard previously enumerated in subsection (c) was moved to subsection (a), and the term genuine 'issue' became genuine 'dispute.' *See* Fed. R. Civ. P. 56 advisory committee's notes (2010 Amendments). However, the 'standard for granting summary judgment remains unchanged.' *Id.*" *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037 n.8 (10th Cir. 2011)

> Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.  Once the plaintiff has established a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action.  *See id.* at 802, 93 S.Ct. 1817.  If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.  *See id*. at 804, 93 S. Ct. 1817.

*Id.* at 1226;  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (accord).

To establish a prima-facie case of discriminatory discharge, the Plaintiff must show that: "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." *Kendrick*, 220 F.3d at 1229.  But "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* at 1227 (quoting *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

> "As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a legally mandatory, rebuttable presumption." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311–12, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996) (citation and quotations omitted).

*Id.*

One way to show pretext is if the plaintiff can demonstrate that the stated reasons for his dismissal are "so incoherent, weak, inconsistent or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (internal quotation marks omitted).  Another way to show pretext is "by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232.

### C. Negligent supervision under state law.

"Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 134 N.M. 43, 47, 73 P.3d 18, 186 (2003). To establish negligent supervision, the plaintiff must show that the employer knows or should have known, through the exercise of reasonable care, that the employee was incompetent or unfit, and must also prove that the negligent supervision was the proximate cause of the harm the plaintiff suffered. *See F & T Co. v. Woods*, 92 N.M. 697, 699-700, 594 P.2d 745, 747-48 (1979); *Ocana v. Am. Furniture Co.*, 135 N.M. 539, 554, 91 P.3d 58, 73 (2004) ("The proper standard for determining whether an employer should be held liable for negligent supervision or retention of an employee is . . . whether the employer knew or reasonably should have known that some harm might be caused by the acts or omissions of the employee who is entrusted with such position.") (internal quotation marks and bracket omitted); *see also* Restatement (Third) of Agency § 7.05(1) (2006) ("A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent."). Thus, applying the "the 'knew or should have known' standard,"

> to survive summary judgment on her negligent supervision . . . claim, [the plaintiff] must show that a genuine issue of material fact exists as to whether: (1) [the defendant's] employee engaged in a wrongful act that injured [the plaintiff]; and (2) that [the employer] was negligent in supervising or retaining that employee.

*Deflon v. Danka Corp. Inc.*, No. 99-2239, 1 Fed. App'x 807, 2001 WL 13260, **11 (10th Cir. Jan. 5, 2001) (unpublished) (applying New Mexico law).

## II.     UNDISPUTED FACTS.

After working as an assistant manager for three years in a Sam's Club in Wichita Falls, Texas, Plaintiff was promoted by Larry Alderson, a Caucasian, to a General-Manager position ("GM") in Sherman, Texas.  *See* Doc. 52-1 at 3-4.  After working as GM for a couple of years, a new supervisor, Director of Operations Craig Wimsatt, who also is Caucasian, began issuing Plaintiff verbal and written coaching corrections for performance issues, culminating in a "Decision-Making Day Coaching" in May 2001.  *See id.*; *see* Doc. 49-3 at 3 (copy of the coaching policy); Doc. 49-4 at 2 (copy of May, 2001 written coaching stating that there were still cleanliness issues of "dirty floors and dust," missing signage, and inventory issues that had not been corrected since the inspection the previous week; "lower moral due to poor standards, loss of pride, and pressure to perform;" and providing that the next level of action would be demotion or termination).  Plaintiff believes that Wimsatt was too hard on Plaintiff and that Wimsatt criticized performance matters that Plaintiff had never before seen be evaluated, like the cleanliness of door knobs and vents.  Plaintiff also states that Wimsatt told him, "they don't want you here," which Plaintiff interpreted to mean that someone in the corporate offices did not want Plaintiff to be the general manager of a Sam's Club in an area that Plaintiff speculates was "maybe 80 percent white."  Doc. 52-1 at 4-6.  Wimsatt offered Plaintiff a co-manager position with Wimsatt in a Dallas, Texas Sam's Club, and told him he could "start over again," but Plaintiff called the corporate office and asked for a transfer instead.  *See id.* at 5.  Plaintiff did not complain to anyone that he suspected that racial discrimination was a motivating factor behind Wimsatt's criticisms.  *See id.* at 6-7.

Plaintiff became an assistant manager at a Sam's Club in Lubbock, Texas, with Daryl Duncan, an African-American, as his GM, and Brian Collins, another African American, as his

District Manager.  *See id.* at 7-8.  Duncan was later transferred to Dallas, Texas, and Plaintiff was promoted to co-manager of the store for two and one-half years.  *See id.*  Eddie Rejcek, a Caucasian, became Plaintiff's District Manager, and in March 2005, he asked Plaintiff to move to Las Cruces to take the GM position.  Doc. 68-1 at 3.  Membership and sales at the Las Cruces store increased during Plaintiff's tenure as GM.  But in 2010, Al Roberts, a Caucasian, became Plaintiff's supervisor after a store re-alignment.  *See* Doc. 52-1 at 13.  At their first inventory meeting in September 2010, Roberts gave Plaintiff a verbal coaching because Roberts found that "the merchandise was too low . . . things weren't right."  *Id.* at 14; *see also* Doc. 49-5 at 2 (copy of September 14, 2010 verbal coaching stating "basic standards including signing and merchandise" had "dropped from re-grand opening levels;" "member dissatisfaction because of missing or wrong signs on merchandise;" and "potential violation of state laws regarding club signing").  Roberts also conducted an inspection of the Roswell, NM Sam's Club the next day, and the Roswell GM, Jerry Thompson, told Plaintiff that Roberts told Thompson that Thompson needed to be sure "that my [inventory] levels are up," but that Roberts had not given Thompson a formal coaching about it.  Doc. 52-1 at 15.

Roberts subsequently gave Plaintiff written coachings for again failing to have the Las Cruces store ready, and for there still being missing signage in the store.  *See id.* at 17.  In November 2010, Jim Marrufo, Roberts' Human Resources ("HR") assistant, came into the Las Cruces store several times during one week and told Plaintiff that employees had shared "a lot of concerns about you and this building," but he refused to share those issues with Plaintiff.  *See id.* at 17-18, 32.  After these events, Plaintiff called Dedra Dogan, an African American who was a "higher" supervisor in Sam's Club's main HR, to complain that he "felt like there was a race issue going on here and they are out to take [his] position."  *Id.* at 18-19.  Ms. Dogan never

called him back, *see id.* at 19, but when Plaintiff later called her to ask for a transfer, she told him that the company was not doing transfers at that time, *id.* at 20-21.

On December 12, 2010, Mr. Roberts again gave Plaintiff another written coaching after a regional and market visit.  *See* Doc. 49-46 at 2.  Plaintiff had failed to follow up on an associate who had been injured at work; had not utilized the "club standard guide" and other directions to ensure cleanliness, product freshness, and correct signage, and the company had spent $25,000 to assist the Las Cruces store twice to achieve club standards.  *See id.*  Plaintiff acknowledged his failings and committed to working with his associates to correct the problems listed in the "tour notes" by certain deadlines.  *See id.*

After another store realignment, Mr. Rejcek again became Plaintiff's supervisor in January 2011.  Doc. 49-7 at 3.  At his first tour with Plaintiff on January 12, 2011, Rejcek found the store "to be in real bad shape."  *Id.*  Rejcek and his marketing team took pictures, and found several safety issues in the automotive department; pigeon feces all over the front of the store and shopping carts; failure to implement a new business marketing plan; out-of-date bakery products; "major sanitation issues;" pallets of merchandise that were missing the shrink wrap that kept them together; new forklifts that had been "beat up;" and serious failures to follow the OSHA guidelines for forklift operation and preoperational logging.  *Id.* at 5-7.  A management-level employee from another store who accompanied the tour confirmed that there were "a lot of issues with the[Las Cruces] Club" – so many that it was "ridiculous" because they were "enormous" and in every area, like "merchandising, fresh departments, and the back room." Doc. 68-2 at 3.  In addition, Plaintiff could not answer basic questions about his operation that he should have known "off the top of his head," and he had not implemented the company's "5-s" program to control supplies and expenses.  Doc. 49-7 at 7-8; Doc. 49-10 at 5-7 & 49-11 at 1-2

(notes of problems). Rejcek warned Plaintiff that the issues had to be corrected and told him that he would be back in a few weeks. *See id.* at 8. On his next inspection in February, however, Rejcek found the same issues and that Plaintiff had packed up his "personal effects." *See* Doc. 49-7 at 8-9. At that point, Rejcek, after conferring with his regional HR manager, the regional vice president, the market human resource manager, and the asset protection manager, decided to terminate Plaintiff. *See id.* at 9-10. Plaintiff contends that his termination was wrongful because it violated the racial-discrimination statutes.

### III. ANALYSIS

#### A. The claim for racial discrimination.

The parties are at stage three in the *McDonnel-Douglas* analysis. Plaintiff has established facts showing that he belongs to a protected class - African American; that he was qualified for the position; that he was discharged; and that the job was not eliminated. *See Kendrick*, 220 F.3d at 1229. But Defendant has shown uncontroverted evidence that it had valid, non-discriminatory reasons for terminating Plaintiff's employment. Plaintiff's burden, therefore, was to submit sufficient, admissible evidence demonstrating that the justification for his termination was pretextual or that his termination occurred 'under circumstances which give rise to an inference of unlawful discrimination." *Id.* at 1227. As a matter of law, Plaintiff has failed to meet this burden.

Although he attached many exhibits and two affidavits, none of them create a genuine issue of material fact regarding the serious issues that lead to Plaintiff's termination, and none of them give rise to an inference of unlawful racial discrimination. Plaintiff does not attempt to assert that the serious issues that Rejcek found in January 2011 and that were not remedied and resulted in his termination were not present; and his complaints about Roberts' body language

and alleged nit-picking and failure to have "people skills" when dealing with Plaintiff in September-December 2010 do not cast doubt on Rejcek's findings. Plaintiff concedes that he got along well with Rejcek and he "had no issues" with him, and he does not believe that Rejcek treated Plaintiff differently because he is African American. Doc. 52-1 at 12; Doc. 49-2 at 2.

Plaintiff's other "evidence" is similarly unhelpful to establishing pretext or discriminatory intent. A comment of "they don't want you here," which can have many non-discriminatory meanings, made ten years ago by a different supervisor in a different city is irrelevant to Plaintiff's discrimination claim. Plaintiff's own account of his first verbal coaching with Roberts fails to establish a comparable situation when Roberts did not coach Thompson in September 2010. It is undisputed that, not only did Roberts find Plaintiff's inventory to be actually low in September 2010, but that Plaintiff also had failed to ensure that the products had the proper signs on them. *See* Doc. 52-1 at 13-14; *see also* Doc. 49-5 at 2 (copy of September 14, 2010 verbal coaching stating "basic standards including signing and merchandise" had "dropped from re-grand opening levels;" "member dissatisfaction because of missing or wrong signs on merchandise;" and "potential violation of state laws regarding club signing"). In contrast, after Roberts' inspection of Thompson's store, Roberts simply told Thompson to be sure "that [the Roswell store's inventory] levels are up," Doc. 52 at 15. Plaintiff presents no evidence that Thompson's inventory levels were actually too low, or that Thompson had similar problems involving signing or member dissatisfaction, so Plaintiff has failed to show that he was treated differently than Thompson in a way that could establish pretext for Plaintiff's coaching and ultimate termination. *See Kendrick*, 220 F.3d at 1232.

The fact that Plaintiff had previously received good performance ratings while working at other positions (or before the inspections conducted between September 2010 and February 2011

by two different supervisors revealed serious issues that he did not correct) does not make Plaintiff's last three performance evaluations pretextual. And the two affidavits repeating rumors and speculating that someone was out to get Plaintiff or that Plaintiff was being unfairly reprimanded for things he previously had not been reprimanded for do not suggest that the rumors, speculation, or reprimands were racially motivated or that Plaintiff's termination was not justified by the condition of the store and the major safety infractions that undisputedly existed and were not corrected in January and February 2011. Neither of the former employees who submitted the affidavits state that they accompanied Roberts or Rejcek on any of the inspections.

In short, because none of Plaintiff's evidence tends to show that Defendant's nondiscriminatory reason for terminating Plaintiff was pretextual or that his termination occurred in circumstances that could give rise to an inference of racial discrimination, Defendant has met its burden to show that it is entitled to summary judgment on Plaintiff's NMHRA and Title VII claims for racial discrimination.

### B. The state-law claim for negligent supervision.

Defendant seeks summary judgment on Plaintiff's state-law claim for negligent supervision regarding all of the individuals whom Plaintiff asserted breached their duty to him. *See* Doc. 49 at 8-9, 13-15. Plaintiff's response addresses only his negligent-supervision claim involving Dedra Dogan, thus he concedes that he has not presented a genuine issue of material fact regarding the other managers or employees. *See* Doc. 50 at 23; FRCP 56.

Dogan was the former Vice President of Corporate People at the corporate headquarters in Bentonville, Arkansas and is African American. *See* Doc. 62 at 5-6. Plaintiff contends that Defendant was negligent in training, supervising and evaluating Dogan because she failed to follow up on a phone call in which he allegedly complained of discrimination, failed "to properly

document Plaintiff's complaints of discrimination," and failed "to take prompt remedial action to stop the discrimination." *Id.* But according to Plaintiff, the only thing he told Dogan[2] in November 2010 was:

> I need someone to talk to because I'm feeling that -- there's a race thing going on here, that I feel like I'm being discriminated against. And I need to talk to somebody because I don't want this to happen. I want to see exactly what we can do to try to push it to the side so that I can continue to do what I do here in Las Cruces.

Doc. 52-1 at 19. Dogan suggested that Plaintiff talk with Roberts or Marrufo, and when Plaintiff told her that they were the problem, she allegedly told him she would get back to him, but she did not do so. *See id.* Plaintiff spoke to Dogan when the only things that had happened were that Roberts had coached Plaintiff about low inventories, insufficient signage, and customer dissatisfaction, and Marrufo had informed Plaintiff that Marrufo had a stack of complaints from employees about Plaintiff that Marrufo could not discuss with Plaintiff. Plaintiff admittedly did not report these events or why he believed there was a discriminatory motive behind them to Dogan, so there was nothing for her to document or any racially-discriminatory behavior to stop. Plaintiff has failed to submit evidence tending to show that Dogan "engaged in a wrongful act that injured [Plaintiff]; and (2) that [Defendant] was negligent in supervising or retaining that employee." *Deflon*, 2001 WL 13260, at **11. Therefore, the Court will grant summary judgment in favor of Defendant on this claim.

**IT IS ORDERED** that Defendant's motion for summary judgment [Doc. 49] is GRANTED, and Plaintiff's claims are dismissed with prejudice.

---

[2] Dogan testified that she had no recollection of Plaintiff ever calling her; that she would normally begin an investigation on complaints of discrimination; and that employees also could call a toll-free "hotline" to report incidents of discrimination, but she had never heard of Plaintiff. *See* Doc. 62 at 6-7. For purposes of summary judgment, however, the Court has accepted Plaintiff's version of the facts.

**DATED** this 25th day of September, 2013.

_____
MARTHA VÁZQUEZ
U.S. DISTRICT COURT JUDGE

*Attorney for the Plaintiff*:

Daniala Labinoti
Law Firm of  Daniala Labinoti, P.C.
5915 Silver Springs, Bldg. 2
El Paso, Texas 79912

*Attorneys for the Defendant*:

Charlotte A. Lamont
LITTLER MENDELSON, P.C.
6565 Americas Parkway NE, Ste. 200
Albuquerque, NM 87110

Steven G. Biddle
LITTLER MENDELSON, P.C.
2425 East Camelback Road, Suite 900
Phoenix, AZ 85016